Filed 7/21/15  In re Jacob F. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# THIRD APPELLATE DISTRICT

## (Sacramento)

----

| | |
|---|---|
| In re JACOB F. et al., Persons Coming Under the Juvenile Court Law. | C077890 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, | (Super. Ct. Nos. JD233373, JD233374) |
| Plaintiff and Respondent, | |
| v. | |
| TRISHA B. et al., | |
| Defendants and Appellants. | |

Anthony F. (father) and Trisha B. (mother) appeal from the juvenile court's orders terminating parental rights as to minors Jacob F. and M.F.  (Welf. & Inst. Code, § 366.26.)[1]  Both parents contend substantial evidence does not support the court's

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

finding that the beneficial parental relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) does not apply.[2] We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 29, 2013, the Sacramento County Department of Health and Human Services (the Department) filed petitions under section 300, subdivision (b) as to Jacob F., then 22 months old, and M.F., then five years old. The petitions alleged that mother's substance abuse and the parents' domestic violence endangered the minors, and the parents had failed to take advantage of services offered in informal supervision.

The detention report alleged that both parents had tested positive for drugs or had failed to test numerous times. Mother's drug history and the family's history of Child Protective Services (CPS) referrals went back to 1998. The minors tested positive for methamphetamine at birth. The minors' older sibling, C.J., was removed from the parents' custody in 2001; the maternal grandmother Peggy J. had had custody of him as guardian since 2002. The parents denied being married, but father reported he was the minors' father and had raised them.

The jurisdiction/disposition report recommended out-of-home placement for the minors and reunification services for the parents, but deemed the prognosis for reunification poor because the parents had not participated in services or maintained contact with the Department. The parents' twice-weekly supervised visits with the minors began in a public venue, but had to be moved to the foster family agency (FFA) office because of the parents' "concerning behaviors."

At the contested dispositional hearing on September 19, 2013, the juvenile court placed the minors in foster care,[3] found the parents' progress "minimal," and ordered

---

[2] Father contends he had a beneficial parent relationship with only M.F.

2

mother into dependency drug court, from which she was later dismissed for repeated noncompliance.

The permanency report, filed February 14, 2014, recommended termination of the parents' services and the minors' adoption by their current foster parents.

The parents had untreated substance abuse and anger control problems. They had not participated in services and did not think they needed to do so.

The minors were placed together. Their foster mother indicated that the minors had adjusted remarkably well; they were relaxed in the home, which they had come to view as their own, and happy with the foster parents, who loved them and wanted to adopt them. A permanency assessment found the minors generally adoptable.

Both minors were reaching their developmental milestones. M.F. had had behavioral issues and was in therapy, but had improved dramatically in terms of considering others and learning to share with them; she was doing very well in kindergarten. Jacob was too young for school and was not in therapy.

During a visit in December 2013, father demanded the minors' immediate removal from the foster home, claiming they were "being beat up" and he had reported it. When the social worker told him all reports would be followed up but the minors could not be removed immediately, he became very angry, yelled that he wanted the minors " 'fucking moved now,' " and left.[4]

---

[3] The maternal grandmother was ineligible for placement of Jacob and M.F. due to a 2006 felony drug conviction.

[4] An addendum explained that separate accidents in October and December 2013 had caused the minors to suffer facial marks and scratches, shown in pictures submitted by father. No one in the foster home inflicted those injuries.

After a contested permanency hearing in April 2014 (§ 366.21, subd. (e)), on May 16, 2014, the juvenile court terminated the parents' reunification services and set a selection and implementation hearing for September 2014.

On July 29, 2014, father filed a petition to modify court orders (§ 388), seeking the minors' return or the reinstatement of reunification services.

On August 8, 2014, the juvenile court denied father's petition summarily.

The selection and implementation report, filed August 19, 2014, recommended termination of parental rights and adoption of the minors.

The minors continued to meet their developmental and educational milestones. M.F., about to start first grade, was bright and a good student. Her behavior had improved greatly over the last year; however, she still attended biweekly counseling, and the foster parents were "working on various social and emotional concerns in addition to boundaries and coping skills."

The minors called the foster parents "mom" and "dad" and had a positive relationship toward them. Jacob looked to them to meet his needs; during visits he did not appear to enjoy interacting with father and mother and was not engaged with them the greater part of the time. M.F. stated she was happy living in her current home; she appeared to enjoy her visits with father and mother "when they are engaged and appropriate." The minors had been in the foster home for over a year and had integrated into the foster family.

The foster parents wished to adopt the minors and had recently begun their homestudy. There appeared to be no barriers to the completion of the homestudy within the next six months and approval of the home for adoption.

Father and mother visited twice a week for an hour at a time until early August 2014, when the visits were reduced to once a week for an hour. Though regular, they had

4

not always been beneficial for the minors. The minors did not cry for father and mother or ask for them when they were not around.

In a July 2014 visit observed by the Department social worker, Jacob spent most of the time playing alone; at one point he ran to the foster mother and hugged her. At the end of the visit, he refused father's request for a hug. M.F. gave father a hug at his request, and both minors hugged mother at her request. The minors were not distressed by the end of the visit and easily returned to the foster parents' care.

The visits had recently deteriorated, and the parents had been reprimanded for inappropriate behavior and conversations with the minors. The parents were advised they could not discuss things that would make the minors feel bad during visits or phone calls. The parents had been seen trying to whisper to M.F. out of the visitation monitor's earshot; as a result, they were no longer allowed to walk the minors to the foster mother's car after visits. On M.F.'s birthday, she was told she should not be calling the foster mother "mom"; she then told the foster mother about this, but added, "you are my mom and I have to call you ' "mom." ' " The parents had argued with the minors in phone calls and at visits because the minors called the foster mother "mom." On Father's Day, father was upset because M.F. said she was happy to have two dads. M.F. reportedly hung up the phone in frustration when the parents yelled at her and reprimanded her. Recently, she had cut phone conversations with them short or refused to come to the phone.

At a visit on August 8, 2014, father was falling asleep, and then became disrespectful to the visitation supervisor; the visit had to be curtailed. Due to this incident and the others mentioned above, visits had been reduced to once a week.

On September 12, 2014, the juvenile court ordered a contested selection and implementation hearing. The parents' trial briefs raised the beneficial parental relationship exception to adoption.

On October 16, 2014, father and the maternal grandmother filed section 388 petitions seeking the relocation of the minors to the maternal grandmother's home. The petitions alleged that the minors were not happy in the foster home and raised charges that included inadequate feeding and clothing, Jacob's regression to diapers after potty training, physical injuries to the minors, possible sexual abuse of M.F., abuse of the minors by the foster parents' 11-year-old foster son, and alienation of the minors' affections from the parents by the foster mother. The petitions also claimed that on July 16, 2014, M.F. called father at 9:30 p.m., crying incessantly and telling him she did not want to live in the foster home.

The juvenile court set the modification petitions for consideration at the selection and implementation hearing.

The juvenile court held the selection and implementation hearing on October 22 and 23, 2014. At the outset, the court denied the section 388 petitions because "these children have been placed in this home for a period of time. The adoption process is almost completed, and to change these children's placement and begin the assessment and delay their need for permanency any further was not believed to be in the best interests of the children."

The maternal grandmother, Peggy J., testified as follows:

Peggy J. often accompanied mother and father on visits with the minors. The minors were affectionate toward both parents. The minors ran to the parents at the start of visits and called them "mommy and daddy." During the visits, the minors and the parents played together.

The minors' behavior at the end of visits had changed "a lot," however. Earlier they would walk out to the parents' car to say goodbye, but now they said goodbye and walked off. They accepted the visits' end "fine," without crying or tantrums. "It's not

6

like they make a big deal out of it . . . they know it's going to happen so they don't get upset about it anymore." They had stopped getting upset about visits' end "[p]robably about four months into them being with the foster family." Jacob had "adjusted to it a little more than [M.F.]" because he was younger. M.F. used to be upset when visits ended because she thought she would be going home with the parents, but once she realized that would not happen, she "more or less calmed down to the fact that she'd have to wait until they come to see her next time."

M.F. last asked to go home with the parents "[p]robably the last two or so visits ago." She was not crying, but she hugged mother and asked when she could come home; mother said she was "working on it . . . but it's just not going to happen now."[5]

Father testified as follows:

The parents visited the minors twice a week until the last six weeks, when it was reduced to once a week. At the start of every visit, the minors would run over and throw their arms around the parents, "give big hugs and kisses, and there is a big reunion." The hugging and kissing continued throughout the visits. M.F. was more affectionate than Jacob, who preferred roughhousing. Sometimes Jacob was unwilling to give father a hug or kiss, but that was normal with children; it might happen "10 percent of the time." M.F. had never refused to give father a hug or kiss. However, three or four weeks ago she seemed "standoffish." She was no longer as outwardly affectionate as before, but showed affection in subtle ways.

During visits, the parents and the minors would usually eat food the parents brought, play games, and talk about "everything." The minors called him "daddy." The

[5] Peggy J. also testified about the close ties between the minors and their older sibling, C.J. The parents and C.J. testified to the same effect. However, the juvenile court found that the sibling exception to adoption did not apply, and the parents do not attack that ruling. Therefore we do not discuss the subject further.

7

only uncomfortable topic of conversation was M.F.'s questioning when she could come home. She asked at least once a month; the last time was two weeks ago. She had also made phone calls specifically to ask that question.

The last time M.F. asked to come home during a phone call was three or four weeks ago.[6] She initiated the call at 9:30 p.m., when she would normally be in bed. She was crying and "panicked." It sounded as though the CPS social worker had told her she would be staying in the foster home "forever," and she did not want that. M.F. asked the parents to tell CPS and foster care that she did not want to grow up in a foster home. Father recorded the conversation on his cell phone, and still had the recording.[7]

When father and mother discussed M.F.'s call with the social worker, the social worker "dismissed it as nothing" and claimed she had the right to say whatever she wanted to say to the minors.

M.F.'s moods fluctuated during visits. After that phone call, she seemed "[a] little more withdrawn maybe." Father suspected it had to do with "inappropriate behavior at the foster home," meaning that she had been "touched in places that she shouldn't have been." She seemed to be "scratching down in her nether region" and showed reluctance to use public bathrooms. She was squirmy and did not want to be touched as much as usual. Father did not ask her about it because mother was dealing with it.[8]

---

[6] On cross-examination, father admitted it was "mid to late July" or early August at the latest. As mentioned above, father's most recent section 388 petition alleged the call took place on July 16, 2014. Social worker Jessica Karadsheh testified that she and father discussed the call at a visit on July 17, 2014.

[7] The recording was not offered in evidence.

[8] Father stated that mother had called the Department's hotline without result. He had left messages with the social worker's supervisor; the social worker was almost impossible to reach and did not return his calls.

At the ends of visits, Jacob would sometimes say he did not want to leave; he did not cry, but got angry. M.F. would say that more often. She also did not cry "because she is a brave soldier," but would get defiant when told it was time to leave. Father disagreed with the social worker's claim that the minors showed no distress at the ends of visits, and wondered how she would know their reactions because she had attended only one visit.

Father was never told that he was saying inappropriate things to the minors during visits.

Father opposed the termination of his parental rights because he believed he had a special bond with the minors. If his rights were terminated, he would be "obliterated," and the minors would also be adversely affected.

Mother testified as follows:

At visits, the minors ran to her. She played games with them and brought drawing materials for M.F.

Mother recently gave M.F. a necklace with the word "mother" on it; mother had one with the word "daughter." The purpose was for M.F. to "keep mother on her neck," prompting her to think of mother, so as "to keep us close together."

In the last month, when visits ended M.F. was "sad" and cried, although not after every visit; the last time she cried was about two weeks ago. Jacob hugged the parents but did not cry "so much" and "is okay with leaving."

---

Father claimed the social worker had never given him her phone number or card. He did not ask how he could get in touch with her because she said her function in the case was to get the minors adopted.

Mother had no idea why visits had been reduced from twice a week to once a week, or why the parents were no longer allowed to walk the minors to the foster parent's car at the end of visits.

Mother admitted that at a visit six months ago she told M.F. not to call the foster mother "mom"; however, mother was merely reacting to M.F.'s statement that she felt she had to call the foster mother "mom" but did not want to. Although M.F. now called the foster mother "mom," as recently as two weeks ago she was still upset about it. M.F. was always the one who brought up this topic.

Phone conversations with the minors were supposed to happen twice a week, but lately they had been only once a week. M.F. would always ask about what the parents were doing.

M.F. told mother about a "tickle in her nether regions" three or four weeks ago. Mother thought that either M.F. had been touched inappropriately or she did not know how to wipe herself properly. Mother reported the incident to the Department's abuse hotline, but no one called back. She did not report it to the social worker because it was impossible to get ahold of her and she did not return calls; her supervisor was also unreachable. Mother admitted, however, that she had the social worker's phone number and had given it to father. The parents did not live together.

Mother felt it would be detrimental to the minors to terminate her parental rights and "not have a connection with me." She requested guardianship or permanent foster care.

Called as a rebuttal witness, CPS social worker Karadsheh, the adoptions social worker and author of the selection and implementation report, testified as follows:

Karadsheh was assigned to the case in May or June 2014. She supervised a visit on July 17, 2014, and attended another on August 7, 2014.

10

The parents' visitation was reduced to once a week around August 7, 2014, due to "multiple complaints" from the FFA social worker and the regular visitation supervisor. Karadsheh was told that the parents had inappropriate conversations with the minors during visits and phone calls. Once father had fallen asleep during a visit, then acted argumentatively and aggressively toward the visitation supervisor. According to the FFA social worker, the parents tried "multiple times" to keep M.F. separated from the others at the ends of visits and talked about things directly related to placement or other topics that would upset her, "such as don't call the foster mother 'mom.' " During one visit, the parents got into an argument in front of the minors, and the visit ended early. M.F. became more upset about these things than Jacob.

Karadsheh met with mother on August 7, 2014, and told her the visits would be reduced due to these ongoing concerns, but phone calls would not be reduced. Asked if she knew why phone contact had been occurring only once a week, Karadsheh did not answer directly.[9]

As part of her assessment, Karadsheh spoke twice to M.F. about adoption. In the first conversation, on July 14, 2014, Karadsheh explained, in answer to M.F.'s questions, that adoption meant "she would be here forever."[10] M.F. "didn't really have much of a response about it"; she was playing and did not appear upset. The second conversation, in August, was similar; M.F. "just kept playing and was, like, okay. She was very nonchalant." The foster mother was not present during either conversation. However, when Karadsheh asked the foster mother if she had seen any sign of distress in M.F. on

---

[9] Karadsheh cited an alleged statement by the foster mother about the date of the most recent phone call. After a sustained hearsay objection, counsel dropped the subject.

[10] Karadsheh did not recall saying adoption would mean M.F. would never see her parents again; Karadsheh would have no way of knowing if that was true. However, if that happened, it would not be detrimental to M.F.

this topic, the foster mother mentioned that "about three days later during a [phone] conversation with her mother . . . there was some upset in that conversation."[11] The foster mother was present during that call and told Karadsheh about it.

On July 17, 2014, father addressed Karadsheh about the phone call; she told him that she would talk to M.F. about it, and did so. Father's testimony as to what M.F. said in the call "wasn't the gist of the conversation that I'm aware of."

When Karadsheh returned from a six-week medical leave, she saw a report about M.F.'s supposed tickle in her vaginal area. The report stated that the CPS "worker of the day" called the Department's hotline, but they did not open a case based on mother's call because "there wasn't an actual allegation, so mom just has a concern." But according to another social worker who followed up on the matter, M.F. "reported she had never been inappropriately touched in this home or any other home and is happy in the home."

Karadsheh recommended that the minors be adopted as a sibling set by their current foster parents, although they were generally adoptable and could be adopted separately. It would not be against the minors' best interests to terminate parental rights. Legal guardianship would be inappropriate because the acrimony between the parents and the foster parents would not be beneficial to the minors.

On November 14, 2014, the trial court issued an oral and written ruling. As relevant to the beneficial parental relationship exception to adoption, the ruling stated:

"Pursuant to the requirements of . . . Section 366.26 [fn. omitted], the court must select a plan of adoption if the court can find by clear and convincing evidence that the children are adoptable, unless there is a compelling reason to determine that termination of parental rights would be detrimental to the child due to one of the enumerated

---

[11] Presumably this was after Karadsheh's July 14 conversation with M.F.

12

exceptions listed in 366.26(c)(1)(B). In the present case, the court heard the testimony of parents and relatives of the child[ren]. The primary arguments following the close of evidence addressed the detriment to the children of terminating parental rights . . . .

"In the Report dated September 12, 2014, the social worker concluded . . . that the children were generally adoptable. They are young, healthy, with no behavioral concerns, and are currently meeting their developmental milestones. They have resided with a foster parent for over one year who desires to adopt both children and who has begun a home study. The social worker's opinion was that there were no barriers to the adoption of these children. There was no evidence presented to the contrary. Therefore, the court finds the evidence is clear and convincing that the children are likely to be adopted within a reasonable time period.

"The parents . . . argued that it would be detrimental to the children if parental rights were terminated. The court disagrees and finds that although the parents have visited regularly, they have failed to prove that the children would benefit from continuing the parent-child relationship with their parents. The originating situation which brought the children to the attention of CPS was the mother's alcohol addiction and the parents' domestic violence . . . . After almost a year of making reasonable services available to the parents, they failed to participate and make any substantive progress. The parents continued to show signs of aggression toward each other even during their monitored visits with the children. The . . . social worker . . . reported the following:

" 'There have been incidents of the parents arguing at the visits upsetting the children with inappropriate subjects and a lack of engagement by the parents towards the children, mostly Jacob, during many of the visits. [The children] easily separate from the parents at the end of the visits with no distress for their parents, only from the parents'

13

behaviors. The children don't cry for the parents or ask for the parents when they are not around.'

"This statement was corroborated by the testimony presented to the court. The children's grandmother confirmed that the children accept when the visit will end and are not upset; that their behavior changed about four months after they were removed (i.e., in 2013). Although in the parents' testimony they discussed their concerns about the children's care by the foster parents, their concerns about the actions of the employees of [CPS], and their feelings about being the only ones who can truly understand and properly care for their children, the court is not persuaded. Having heard and weighed all the testimony, the court can find no compelling reason to determine that these children would benefit from a continuing relationship with their parents to such a degree as to outweigh the well-being that the children would gain in a permanent home with new, adoptive parents. Having balanced the strength as well as the quality of the relationship that these children have had with their parents in their young lives, and having considered the possible harm that would come from severing the natural parent-child relationship, the court concludes that the parents have failed in their burden to persuade the court that the preference for adoption has been overcome."

**DISCUSSION**

The parents contend substantial evidence does not support the juvenile court's rejection of the beneficial parental relationship exception to adoption. We disagree.

" 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

14

There are only limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child . . . ." (§ 366.26, subd. (c)(1)(B).) One of these is where the parent has maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship, often referred to as the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) The benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); accord, *In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*); *In re B.D.* (2008) 159 Cal.App.4th 1218, 1234-1235; *In re Helen W.* (2007) 150 Cal.App.4th 71, 81; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 953.) Even frequent and loving contact is not sufficient to establish this benefit absent a significant, positive, emotional attachment between parent and child. (*C.F.,* at p. 555; *Autumn H.,* at p. 575.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*C.F.*,

*supra*, 193 Cal.App.4th at p. 553.)  The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment.  (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)  " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . .  Broad deference must be shown to the trial judge.' " (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

Given the Legislature's strong preference for adoption, where adoptable minors are placed with a prospective adoptive family to which they have bonded and which meets their needs, that almost ends the discussion.  (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228-229, 231; *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)  Such is the case here.  As the juvenile court found, the minors were generally adoptable, had lived for over a year with foster parents who wished to adopt them, and were thriving in their foster home.  So far as the parents presented evidence of problems or mistreatment of the minors in the foster home, the court impliedly rejected that evidence as not credible, and we may not reweigh that finding.  The evidence the court recited, when reviewed with the deference due on appeal, was sufficient to support its ruling. (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)

Both parents attack the sufficiency of the evidence to support the juvenile court's ruling by disregarding the deferential standard of review we must apply and recounting the evidence most favorably to themselves.  Mother simply omits the evidence supporting

16

the ruling, such as the social worker's report and testimony, and recites only the parents' evidence.[12] Father acknowledges the existence of opposing evidence, but only to assert baldly that it should be rejected as "general" or "conclusory," or to try to explain it away with pure speculation.

Mother asserts that because certain evidence favorable to the parents was uncontradicted, the juvenile court was required to accept it. Mother is mistaken. A trier of fact need not accept any evidence as true merely because it is uncontradicted. Some of the evidence mother cites was not uncontradicted. And even the genuinely uncontradicted evidence mother cites is not enough to show that insufficient evidence supported the juvenile court's ruling.

Mother relies on *Krause v. Apodaca* (1960) 186 Cal.App.2d 413 (*Krause*), which quotes older decisions, as holding that " 'testimony which is not inherently improbable and is not impeached or contradicted by other evidence should be accepted as true by the trier of fact' " (*id.* at p. 417), and that " ' "the uncontradicted testimony of a witness to a particular fact may not be disregarded, but should be accepted as proof of the fact." ' " (*Ibid.*) However, the same decision also acknowledges "the general rule that . . . '[p]rovided the trier of the facts does not act arbitrarily, he may reject *in toto* the testimony of a witness, even though the witness is uncontradicted.' " (*Id.* at p. 419.) The evidence at issue in *Krause* was uncontradicted and compelling expert testimony, apparently rejected by the trier of fact in favor of an inference the experts had conclusively rebutted. (*Id.* at pp. 417-419.) In our view, *Krause* cannot be extended beyond its peculiar facts to support a rule that any uncontradicted evidence, no matter

---

[12] It is immaterial that mother's brief mentions opposing evidence in passing in its statement of facts. To make a proper insufficient evidence argument, an appellant must confront that evidence squarely and show why it is inadequate. (See *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

how implausible, is binding on the trier of fact, and more recent case law has made clear that there is no such rule. (See, e.g., *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

Furthermore, some evidence mother calls uncontradicted is not so. Mother asserts that the maternal grandmother's testimony about the minors' open display of affection toward the parents during visits was uncontradicted. In fact, the social worker's report states that during the visit she observed, Jacob spent most of his time playing alone and refused father's request for a hug at the end of the visit, while spontaneously running to the foster mother and hugging her during the visit; even M.F. hugged father only at his request. Furthermore, the maternal grandmother's testimony, so far as it aimed to show the depth of the bond between the parents and minors, contradicted itself to some extent: The maternal grandmother testified, consistent with the social worker's view, that the minors had come to accept the end of visits as "not . . . a big deal" after four months in the foster home.

Though not asserting that the juvenile court should have accepted any evidence merely because it was uncontradicted, father puts great stress on his account of M.F.'s late-night July phone call in which she allegedly cried, sounded panicked, and insisted she did not want to stay in the foster home forever. Father also states that the social worker "corroborated" that account. The last point misrepresents the record. The social worker corroborated that the call was made, but stated that father's version of what M.F. said "wasn't the gist of the conversation that I'm aware of"; the social worker also noted that she had heard about the call from the foster mother, who was present while it happened, and who consistently indicated that M.F. was happy and well adjusted in her home.

But even uncontradicted testimony that the minors showed affection and enjoyed the parents' visits did not show by a preponderance of the evidence that the benefit of continuing the parental relationship would outweigh the benefit of adoption (see *C.F.*,

18

*supra*, 193 Cal.App.4th at p. 555; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575)—nor did a phone call from M.F., whatever its contents, which took place over two months before the selection and implementation hearing, and which the juvenile court had to set against the abundant evidence that M.F. was happy in the foster home as of the hearing date.

The parents raise additional legal contentions that we reject.

First, the parents assert that the case law construing section 366.26, subdivision (c)(1)(B)(i) has improperly added conditions to the statute, making the parents' burden greater than the Legislature intended. This contention is unsupported by authority and inconsistent with the statutory scheme.

The parents note that the statute requires proof that the child would "benefit" from continuing the parental relationship, but does not specify that the benefit must be "substantial," that the minor must be "greatly harmed" by severing the parental relationship, or that the benefit of preserving the parental relationship must "greatly outweigh" the benefit of adoption. Thus, in the parents' view, if they have shown *any* benefit to the minors from continuing the parental relationship, they should prevail, and this court should disregard the *Autumn H.* balancing test as a judicial excrescence on the statute's plain meaning. Unsurprisingly, they cite no authority supporting their position, and we know of none. (Cf. *People v. Stanley* (1995) 10 Cal.4th 764, 793 [legal propositions asserted without developed argument and apposite authority forfeited].)[13]

_____

[13] Mother cites *In re K.H.* (2011) 201 Cal.App.4th 406 for the premise that the statute's "plain meaning" controls, but that decision does not discuss the beneficial parental relationship exception. (*Id.* at pp. 414-420.) Father cites a dictionary definition of "benefit" as "anything contributing to an improvement or advantage," but does not show that the Legislature had that definition in mind when it enacted section 366.26, subdivision (c)(1)(B)(i).

19

In any event, the juvenile court may not assess "benefit" under section 366.26, subdivision (c)(1)(B)(i) in a vacuum: It must do so in light of the Legislature's clearly stated preference for adoption. (§ 366.26, subd. (b)(1)-(6) [setting out order of preference for placement, with adoption first].) A court cannot decide whether children would benefit from continuing a parental relationship *sufficiently to avoid the Legislature's preference for adoption* without assessing the strength of that benefit and weighing it against the benefit from adoption. Thus, we see no reason to reject the *Autumn H.* balancing test, which has been consistently followed by later courts.

Citing psychological studies of adopted children (which are not authority for this court), father asserts: "[A] comparison of a parental relationship to the perceived benefits of adoption and permanence is not possible because the actual benefits of adoption versus maintaining a relationship with the natural parents is [*sic*], in the end, unknowable." But, by requiring courts to choose adoption unless a statutory exception applies, section 366.26 requires them to make and resolve the comparison father calls "not possible." Thus, like the parents' previous point, this contention is at odds with the statutory scheme.

Mother asserts the juvenile court should have ordered legal guardianship as the permanent plan, claiming that it provides "all of the necessary and desired stability and permanence that a child requires." This premise ignores the statutory preference for adoption when minors have been found adoptable, as here. It also ignores the social worker's opinion, impliedly accepted by the juvenile court, that if the foster parents became the minors' legal guardians, the parents' animosity toward the foster parents would undermine the minors' sense of stability and permanence.

Lastly, the parents rely heavily on three appellate decisions: *In re Brandon C.* (1999) 71 Cal.App.4th 1530 (*Brandon C.*), *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*),

20

and *In re Scott B.* (2010) 188 Cal.App.4th 452 (*Scott B.*). These decisions are clearly distinguishable.

In *Brandon C.*, *supra*, 71 Cal.App.4th 1530, the appellate court affirmed an order of legal guardianship, appropriately applying the deferential substantial evidence standard of review. (*Id.* at pp. 1532, 1534.) The minors' caretaker, the paternal grandmother, preferred to adopt the children but was willing to be their legal guardian. She believed it was in the children's best interest to continue a relationship with their mother and father. (*Id.* at pp. 1532-1533.) The agency, which appealed from the order, presented no evidence that the bond between the mother and the minors was not close or that continuing contact would not be beneficial to the minors. (*Id*. at p. 1537.) As the facts and the procedural posture of *Brandon C.* are entirely different from those of the present case, *Brandon C.* does not support the parents' position.

In *S.B.*, *supra*, 164 Cal.App.4th 289, the appellate court reversed an order terminating parental rights because the father had fully complied with his case plan and the appellate court found the minor would benefit from continuing contact with him; the court found it insufficient to justify termination of parental rights that the minor also had a strong relationship with her caretaker and the caretaker promised continued visitation with father. (*Id.* at pp. 293, 298-301.) However, so far as *S.B.* purported to hold that "some measure of benefit" from the father's visits was sufficient to avoid the termination of parental rights (*id.* at pp. 300-301), an argument made by father in reliance on *S.B.*, it has been repeatedly distinguished or criticized by later decisions, including two from the district that decided *S.B.*

Thus, in *In re Jason J.* (2009) 175 Cal.App.4th 922 (*Jason J.*), the court that decided *S.B.* stated: "The *S.B.* opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal

whenever there is 'some measure of benefit' in continued contact between parent and child." (*Jason J.*, at p. 937.)

Two years after *Jason J.*, the same court reiterated this point with some exasperation: "Our effort in *Jason J.* to discourage the improper and inaccurate use of our opinion in *S.B.* has not been successful. Following *Jason J.*, in literally dozens of unpublished opinions various panels of this court and courts in other appellate districts have been required to distinguish *S.B.* on its facts and repeatedly reject the notion a parent can prevent termination of parental rights by merely showing there is some measure of benefit in maintaining parental contact. We have not found any case, published or unpublished, in which a reviewing court, relying on *S.B.*, provided relief to a litigant whose parental rights were terminated. [¶] . . . [¶] In light of these circumstances, we once again emphasize that *S.B.* is confined to its extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact. As *Autumn H.* points out, contact between parent and child will always 'confer some incidental benefit to the child,' but that is insufficient to meet the standard. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Moreover, given the unwarranted burden placed on this court and other courts by appellate counsel's reliance on *S.B.* when the facts are not even arguably similar, we observe: 'Counsel should not forget that they are officers of the court, and while it is their duty to protect and defend the interests of their clients, the obligation is equally imperative to aid the court in avoiding error and in determining the cause in accordance with justice and the established rules of practice.' " (*C.F.*, *supra*, 193 Cal.App.4th at pp. 558-559; accord, *In re J.C.* (2014) 226 Cal.App.4th 503, 529-530.)

We note with disapproval that the parents fail to cite *C.F.* or *In re J.C.*, and although father cites *Jason J.*, he overlooks its remarks on *S.B.*

22

Finally, in *Scott B.*, *supra*, 188 Cal.App.4th 452, the appellate court reversed an order terminating parental rights where the minor was 11 years old, autistic, and emotionally unstable, and failed to understand that adoption might mean the end of contact with his mother, to whom he had been closely bonded and with whom he had lived for almost his whole life. (*Id*. at pp. 471-472.) The court found that, given his strong emotional attachment to mother, his precarious emotional state, and his history of regressing or running away when stressed, the termination of parental rights entailed "a very good chance that he will have a meltdown if his usual frequent visitation with [m]other does not continue"—"the chance of a danger not worth taking." (*Id.* at p. 472.) The court found further that, on these extraordinary facts, "[t]ermination of parental rights is unnecessary given that a legal guardianship will provide Scott with stability in his life." (*Ibid*.) Because these facts in no way resemble the facts of the present case, *Scott B.* does not assist the parents.

## DISPOSITION

The orders terminating parental rights are affirmed.


                                                                BUTZ            , J.

We concur:


      BLEASE          , Acting P. J.


      HULL           , J.

23